**A. LEO NASH STEEL CORPORATION,**
Plaintiff-Appellee,

v.

**C. D. PERRY & SONS, INC.,**
Defendant-Appellant.

No. 235, Docket 72–2228.

United States Court of Appeals,
Second Circuit.

Argued Dec. 18, 1973.

Decided Feb. 15, 1974.

Leslie F. Couch, Albany, N. Y. (Di-Fabio & Couch, Albany, N. Y., on the brief), for defendant-appellant.

Max Gordon, Albany, N. Y. (O'Connell & Aronowitz, P. C., Albany, N. Y., on the brief), for plaintiff-appellee.

Before FRIENDLY, FEINBERG and OAKES, Circuit Judges.

FEINBERG, Circuit Judge:

Appellant C. D. Perry & Sons, Inc., ("Perry") appeals from a judgment of the United States District Court for the Northern District of New York, Peirson M. Hall, J.,[1] awarding appellee A. Leo Nash Steel Corporation ("Nash") $15,113.95 with interest, the amount owing on a contract for steel sold and delivered to Perry, and dismissing Perry's counterclaim for breach. Our role in reviewing a case tried to the court is limited to determining whether or not the judge's findings were "clearly erroneous," Fed.R.Civ.P. 52(a), or his conclusions of law incorrect. Although our task would have been considerably lightened had the trial court provided us with even a short written opinion instead of an oral decision, rendered in open court and supplemented by incomplete[2] findings of fact and conclu-sions of law submitted by Nash, we have nonetheless concluded that the right result was reached. We therefore affirm the judgment of the court below.

The record reveals the following sequence of events. Early in 1967, Perry contracted with the State of New York to reconstruct a bridge in Saratoga County, New York. The agreement originally called for completion by December 1, 1968; it was twice extended, at Perry's behest, so that the final date for performance was August 8, 1969. In order to fulfill its commitment to New York State, Perry entered into a written contract with Nash whereby the latter, on July 21, 1967, agreed to sell structural steel to Perry "for delivery in early spring." Nash then subcontracted the order, as Perry had known it would do, to Connecticut Structures, Inc. ("Connecticut").

From then on, Perry continually backed and filled on the tentative date for delivery, although Nash, needing the money, pressed for delivery.[3] On May 1, 1968, Nash wrote Perry, acknowledging that Nash had been advised "that delivery on the bridge we are fabricating for you will not be required until about September 1, 1968." Nash added that it wished to be paid on approximately July 1, "inasmuch as were told to have it [the steel] ready for the end of May; and . . . do not feel that we should bear the consequences of tying up our money until September or October . . . ." On August 7, 1968, an involuntary petition in bankruptcy was filed against Nash's subcontractor, Connecticut. After unsuccessfully trying to arrange for the completion of the steel fabrication with Connecticut's receiver in bankruptcy, Nash ordered the steel for the bridge from Anthracite Bridge Company ("Anthracite"). As Nash in-

1. Senior judge of the United States District Court for the Central District of California, sitting by designation.

2. These findings omit many of the most important facts regarding the crucial issue on this appeal: the timeliness of Nash's delivery of steel to Perry.

3. In November 1967, Perry projected a date of approximately May 1968. In February 1968, this was postponed to approximately July 1, 1968. In March, the estimate was updated to June 3.

formed Perry, however, the earliest time for delivery would now be November since Anthracite had to obtain steel prior to fabrication. During the oral discussions about this problem, Perry suggested to Nash: "[W]hy don't you see what you can do, being that November is going to be too late for us, . . . about getting the steel to us in the spring of '69." This was one year later than the original contract date.

Thereafter—apparently out of the blue—on August 20, 1968, Perry wrote Nash the following curt missive:

> The failure to deliver the Structural Steel for the above project this summer will result in extra costs to us. We wish to inform you that we will hold you responsible for these extra costs.

On August 26, Perry sent another letter. After alluding to a purported August 15 delivery date which Nash had been unable to meet, Perry concluded: "The latest date we believe that we can accept delivery and finish our project this year is October 1, 1968." On December 3, however, in a typical about-face, Perry wrote:

> We are ready for the structural steel on the above project at present. It is our intent to commence erecting said structural steel the last week of March 1969. Therefore, please schedule your fabrications and delivery to insure that our schedule will be met.

Nash delivered the steel in March as requested. Perry accepted the deliveries and finished the bridge, but failed to pay Nash $15,113.95, the unpaid balance on the contract. Alleging diversity of citizenship, Nash brought the instant suit to recover the amount owing. Perry counterclaimed for $16,526.80 in damages,[4] which it asserted were caused by Nash's breach of contract in failing to make "timely delivery" of the steel. Having lost in all respects below, Perry pursues this appeal.

■ The mere recital of the facts shows that the equities favor appellee Nash, and the equities here accord with the law. The original written contract provided for "delivery in early spring [1968]." It is true that although time was not of the essence under the contract, Nash's agreement to deliver in the spring would not have been fulfilled by delivery in August. But the correspondence makes clear that the last thing Perry wanted was delivery in that spring. In its May 1968 letter to Perry, Nash reluctantly expressed its understanding that delivery should not be made to Perry until September 1, a date obviously forced upon Nash by Perry. Clearly, then, Nash could not have been in breach by failing to deliver in August. The August 20 note from Perry, purporting to hold Nash "responsible for . . . extra costs" incurred by late delivery, was therefore wholly ineffective. The earliest day on which Nash could have been in default was September 1, 1968. But on August 26, Perry wrote Nash: "The latest date we believe we can accept delivery and finish our project this year is October 1, 1968." The fair intent of this letter is that performance by the extended date would satisfy Perry and discharge Nash's duty.

■■ To be sure, Nash did not deliver the steel by October 1. (It had already indicated in August, in oral exchanges with Perry, that the bridge would not be ready until November.) This failure to perform by October 1 did not, however, subject Nash to damages. Under all the circumstances, we will not say that delivery by Nash to Perry in November or even in early December would not have been timely enough. On that assumption, Perry's advice to Nash on December 3 to deliver by "the last week of March," Perry's intended date "to commence erecting," rendered timely Nash's subsequent delivery in March 1969. Finally, even if Nash had actually delivered the steel by October 1, the

---

4. Perry claimed that the "delay" in delivery forced it to incur additional expenses—particularly for labor, since new union contracts in 1968–69 resulted in increased wages.

record supports a finding that Perry would not, in any event, have been able to complete the bridge that year.[5] Assuming arguendo that Nash had technically breached the contract by failing to deliver on October 1, 1968, Perry's damages would not have been caused by Nash.

Thus, on the record, Nash had the right to the full contract price for its goods. Accordingly, we affirm the judgment of the district court, awarding Nash the balance due on the contract of sale and dismissing Perry's counterclaim for damages.

5. There was testimony that, among other things, concrete cannot be poured economically when the temperature is less than 45 degrees, and bituminous paving cannot be laid on the New York state highway system without special permission after October 15. These factors explain Perry's oral discussion in August and its December 3 letter, both indicating that its real concern was delivery by March 1969.